AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  **23MJ1149** |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| | |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Travis Desmond*

Applicant's  signature

Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ *(specify reliable electronic means).*

Date:  3/29/23

Judge's signature

City and state: _____

Jill L. Burkhardt

Printed name and title

**AFFIDAVIT**

I, Special Agent Travis Desmond, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.     I make this affidavit in support of an application for a search warrant (1) for information associated with six iCloud accounts (the **Target Accounts**) and three phones (the **Target Phones**). The **Target Accounts** are described in Attachment A-1 and the **Target Phones** are described in Attachments A-2, A-3, and A-4.  There is probable cause that the **Target Accounts** and the **Target Phones** are all being used by members of the same Drug Trafficking Organization (the DTO) which conspired to import controlled substances from Mexico into the United States, with a base of operations in Yakima, Washington, using stolen vehicles.  As set forth below, the **Target Accounts 1-3** are being used by Ricardo ORIZABA, from whom agents seized 1.8 kilograms of heroin, 2.25 kilograms of fentanyl, and three firearms on February 8, 2023.  **Target Account 4** is used by Deliyla HERNANDEZ, who is a witness to a drug-conspiracy related double homicide. **Target Accounts 5** and **6** were used by Benjamin MADRIGAL on June 19, 2021, when he was arrested with methamphetamine, cocaine, and fentanyl.  The **Target Phones** were seized from Jose Orizaba (Ricardo ORIZABA's brother) and Benito MADRIGAL while they were transporting fentanyl and cocaine on June 24, 2022.

2.     The **Target Accounts** are stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way,

Cupertino, California.  The information to be searched is described in the following paragraphs and in Attachments A-1 through A-4.  As to the **Target Accounts**, this affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B-1.  Upon receipt of the information described in Section I of Attachment B-1, government-authorized persons will review that information to locate the items described in Section II of Attachment B-1. As to the **Target Phones**, I seek permission to seize information set forth in Attachment B-2.

3.     The **Target Phones** are currently in the custody of Homeland Security Investigations at located at 880 Front Street, Suite 3200, San Diego, California 92101.

4.     As set forth herein, there is probable cause to believe that the **Target Accounts** and the **Target Phones** contain evidence of violations of Title 21, United States Code, Sections 841 and 846, as further described in Attachments B-1 (as to the **Target Accounts**) and B-2 (as to the **Target Phones**).  The requested warrant relates to the investigation and prosecution of Ricardo ORIZABA, Jose ORIZABA, Benito MADRIGAL, Benjamin MADRIGAL, and others, for possessing with the intent to distribute controlled substances and conspiring to distribute controlled substances within the United States.

5.     **Target Accounts 1-3** are connected to Ricardo ORIZABA through a white Apple iPhone seized from him on February 8, 2023 (Seizure No. 2023302800001401-

0005) (the "white iPhone").   On March 10, 2023, the U.S. District Court for the Southern District of California issued a warrant authorizing a search of the white iPhone. That search revealed that ORIZABA stored information relating to the following Target Accounts on the white iPhone:

- **Target Account 1**: marcy.kennedy1@icloud.com

- **Target Account 2**: ricardo.orizaba@icloud.com

- **Target Account 3**: flowersonthe14@icloud.com

**Target Account 4** is associated with a phone used by Deliyla HERNANDEZ, who, as set forth below, communicated with Benjamin MADRIGAL during the time Benjamin MADRIGAL reportedly confessed to murdering three people related to the drug distribution conspiracy.

- **Target Account 4**: deliyla.andrade@icloud.com

**Target Accounts 5** and **6** are associated with phones seized from Benjamin MADRIGAL on June 19, 2021, when he was arrested with methamphetamine, cocaine, and fentanyl.

- **Target Account 5**: tona-loma8@icloud.com

- **Target Account 6**: tonylomas8888@icloud.com

As set forth in Attachment A-1.

6.     The **Target Phones** are identified in Attachments A-2 through A-4 as follows:

- A Blue Motorola cell phone
  Seizure No. 2022250100052501-0001
  (**Target Phone 1**) as described in Attachment A-2

- A Blue iPhone cell phone
  Seizure No. 2022250100052502-0001
  (**Target Phone 2**) as described in Attachment A-3

- A Blue Cricket cell phone
  Seizure No. 2022250100052502-0001
  (**Target Phone 3**) as described in Attachment A-4

Law enforcement found and seized **Target Phone 1** from the center console of a Ford Raptor occupied by Jose ORIZABA and Benito MADRIGAL. Jose ORIZABA told officers that the phone belonged to him. Officers found **Target Phone 2** in the Ford Raptor's front passenger seat and **Target Phone 3** in the center console. Benito MADRIGAL told officers that **Target Phones 2 and 3** belonged to him. Officers also found fentanyl and cocaine in the Ford Raptor, as set forth below.

7.    The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Phones**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## JURISDICTION

8.    As to the **Target Accounts**, this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court

4

is "a district court of the United States . . . that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

9.     As to the **Target Phones**, this Court has jurisdiction to issue the requested warrant pursuant to Rule 41(b)(1) of the Federal Rules of Criminal Procedure because the property to be searched is located in the Southern District of California.

## AFFIANT'S BACKGROUND

10.     I have been employed as a Special Agent with Homeland Security Investigations (HSI) since December of 2019. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California, as a member of the Organized Crime Drug Enforcement Task Force (OCDETF) Strike Force. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

11.     During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California.  Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import and distribute narcotics into and within the United States from Mexico at Ports of Entry.

12.     I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones.  A common tactic utilized by narcotics traffickers

is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States.

13.    Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications,

6

photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

    a.    tending to indicate efforts to distribute controlled substances within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in distribution of controlled substances within the United States;

    d.    tending to identify travel to or presence at locations involved in the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points, or the whereabouts of persons involved in such activity;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Phones**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

### Overview

14.    Homeland Security Investigations (HSI) is investigating a Drug Trafficking Organization (DTO) based in Yakima, Washington and Visalia, California that recruited drivers to cross drugs into the United States and distributed those drugs

to various locations within the United States. Narcotics couriers who have been charged in this investigation include Ricardo ALFARO, Marco BUSTOS, Fernando GOMEZ, Rafael LOYA, Jaime MALDONADO, and Nicholas PINA. Witness interviews and consensual and court-authorized searches of cell phones used by those couriers revealed that the couriers were recruited and managed by Benjamin MADRIGAL aka "Tony" (the brother of Benito MADRIGAL).  Benjamin MADRIGAL is charged in the District of Oregon and has been a fugitive since June 2021. Between the summer of 2021 through September 2022, Benjamin MADRIGAL was assisted by Cesar MURILLO and Mayra HERNANDEZ, who sent wire transfers to load drivers, received narcotics and bulk cash, and dispatched load drivers to destinations within the United States.[1] Benjamin MADRIGAL was also assisted by Ricardo ORIZABA (brother of Jose ORIZABA), who distributed narcotics in the Yakima, Washington area, and served as an "enforcer" for MADRIGAL and the DTO to prevent other members of the DTO from cooperating cooperation with law enforcement. I interviewed MURILLO and Mayra HERNANDEZ in late August 2022. As set forth below, witnesses state that within days of that interview, Benjamin MADRIGAL ordered Ricardo ORIZABA to kill MURILLO and Mayra HERNANDEZ.  Ricardo ORIZABA shot MURILLO and HERNANDEZ and burying them in a vacant field outside of Yakima, Washington. MURILLO and HERNANDEZ disappeared in early September 2022 and have had no contact with associates and relatives since that date.

_____

[1]

15.     On February 8, 2023, agents executed a search warrant on Ricardo ORIZABA's residence in Parker, Washington, which is in the greater Yakima, Washington area, and seized fentanyl, multiple firearms including an AR-15 assault rifle and a 9mm handgun with an attached suppressor, ammunition, body armor, high-capacity magazines, a scale, an electronic money counter, approximately 11,000 fentanyl pills weighing 1.337 kilograms, 1 kilogram of fentanyl powder,1.7 kilograms of heroin, and three cellular phones, including the white iPhone.

16.     On June 24th, 2022, CHP officers stopped a blue Ford Raptor in Tulare, California. The CHP officers' reports note that Jose ORIZABA, was driving the vehicle and Benito MADRIGAL was the passenger.  Benito MADRIGAL told the officers that the vehicle belonged to his brother "Tony" [Benjamin MADRIGAL].  The officers asked Jose ORIZABA if they had anything in the vehicle they needed to disclose, and Jose ORIZABA said they only had a few water jugs.  The officers searched the vehicle and found a pink suitcase on the passenger-side floor, behind the passenger-seat.  Benito MADRIGAL told officers the suitcase was his, and that it contained clothing. Officers opened the suitcase and found two large plastic containers, one labeled "Castrol Oil" and the other "Purple Power cleaner."  Officers opened the containers and observed blue pills in clear plastic bags in both containers. Further search of the vehicle resulted in the discovery and seizure of two kilograms of cocaine concealed in a non-factory compartment. Officers seized approximately 151,000 fentanyl pills, weighing 29.64 kilograms, two kilograms of cocaine, and the **Target Phones**, as noted above.

17.     On the date the seizure occurred, the Ford Raptor was registered to Mayra HERNANDEZ.  As set forth below, Mayra HERNANDEZ was Cesar MURILLO's domestic partner in 2021 and 2022, and witnesses state that Benjamin MADRIGAL, Benito MADRIGAL, and Jose ORIZABA all worked for MURILLO and Gilberto ORTIZ (AKA "El Guero") transporting drugs.

### Evidence Tying the Seizures to the Same DTO

18.     There is probable cause to believe that the seizures described above – One from the Washington residence and the other from the Ford Raptor on a California highway – are tied to the same DTO, which also operated in the Southern District of California.

19.     This investigation originated with the seizure of narcotics from three stolen vehicles at California ports of entry, and one stolen vehicle on a Colorado freeway, between September 9, 2021, and October 18, 2021. The chart below sets forth the drivers, the vehicles, the date and place where drugs were seized, and the type and quantity of drugs:

| Defendant | Vehicle | Date/place drugs Seized | Type/quantity of drugs |
|---|---|---|---|
| Ricardo ALFARO[2] | 2021 Acura RDX[3] | 9/9/21, Otay Mesa POE | 29.84 kgs meth, 5.5 kgs fentanyl |
| Marco BUSTOS[4] | 2019 Dodge Challenger[5] | 10/18/21, San Ysidro POE | 13.00 kgs fentanyl, 10.06 kgs cocaine, .48 kgs. Meth |

[2] SDCA Case No. 21-CR-2869-CAB.
[3] A blue Acura RDX with license plate No. BM27N15.
[4] SDCA Case No. 21-CR-3211-JLS.
[5] A black Dodge Challenger with license plate No. BM29J99.

| Nicholas PINA[6] | 2020 Ford Mustang[7] | 9/16/21, Grand Junction, CO | 26.8 kgs meth |
| Jaime MALDONADO[8] | 2019 Dodge Ram[9] | 9/28/21, San Ysidr POE | 31.8 kgs meth, 5.34 kgs fentanyl |

As noted, each of those drivers has been charged with a narcotics offense in the Southern District of California.  Each of these defendants has pled guilty, and each of them has confirmed that they were working for the same DTO.  This is corroborated by their phone downloads, crossing histories, and wire transfers, which document extensive communication and travel with each other as well as communications with, and payment from, common coordinators.

20.     I later determined that Fernando GOMEZ, who was arrested on August 5, 2021 (SDCA Case No. 21-CR-2988-AJB) for importing approximately 15 kilograms of methamphetamine from Mexico into the United States, is also associated to this investigation. During a debrief, GOMEZ stated he was recruited by ORTIZ "El Guero" in Visalia, California to smuggle drugs. GOMEZ stated ORTIZ frequented Visalia, CA and Yakima, WA.  I later identified "El Guero" as Gilberto ORTIZ.[10]  GOMEZ then recruited his friends, BUSTOS and PINA. GOMEZ stated he drove a drug load vehicle to a house Yakima, Washington. ORTIZ died of a drug overdose in the Spring of 2022.

[6] SDCA Case No. 22-CR-2700-RBM (currently a fugitive).
[7] A red Ford Mustang with license plate No. BM69E10.
[8] SDCA Case No. 21-CR-3006-BAS.
[9] A silver Dodge Ram with license plate No. BM38F94.
[10]   I found ORTIZ's photo inside GOMEZ's cell phone. Through witness interviews, and DHS database queries, I confirmed that the person in the photo was ORTIZ. I also confirmed ORTIZ's identity by interviewing ORTIZ's widow, Yareli BANUELOS, as described below.

As set forth below, witnesses state that following ORTIZ's death, MURILLO took on leadership responsibilities in Yakima until MURILLO disappeared in early September 2022.

21.    Each vehicle involved in these seizures bore a temporary California plate at the time it was seized. California Highway Patrol investigators inspected each vehicle and determined that each vehicle bore a VIN that did not match any valid number registered in the United States. Further investigation revealed that each vehicle's VIN number had been changed from the VIN number originally assigned to the vehicle at the factory (commonly referred to as a "VIN switch"). Investigators identified each vehicle's true VIN number and determined each had recently been stolen. The chart below sets forth the fraudulent VIN number each vehicle displayed at the time of the seizure, the VIN number assigned at the factory, and the circumstances of each vehicle's theft.

| Vehicle | VIN number displayed | True VIN number | Theft |
|---|---|---|---|
| 2021 Acura RDX | 5J8TC1H67ML018374 | 5J8TC1H67ML018472 | Stolen from an Acura dealership in Montclair, CA |
| 2019 Dodge Challenger | 2C3CDZBT9KH615971 | 2C3CDZBT6KH616379 | Stolen from a Kia dealership in Fontana, CA |
| 2020 Ford Mustang | 1FA6P8TH4M5101191 | 1FA6P8TH4M5101093 | Stolen from Avis car rental, Los Angeles, CA |
| 2019 Dodge Ram | 1C6RR6TT0KS643159 | 1C6RR6TT8KS653955 | Stolen from a rental co. in Dana Point, CA |

22.    Border crossing records show that each of these vehicles made its first entry into the United States within a few weeks prior to the drug seizures driven by Adam PENA.  PENA later told agents that he was working for Daniel SOTO, and that

SOTO obtained stolen cars in the greater Los Angeles area, sent them down to Mexico to have new VINs installed, and then imported the vehicles back into the United Sates. SOTO is charged with car-theft and drug charges in SDCA Case Number 22-CR-2700-RBM and is currently pending trial. Prior to his indictment, SOTO told agents that he provided the cars to a drug trafficking organization. This statement is corroborated by wire transfers sent from MURILLO and Mayra HERNANDEZ, along with additional members of the DTO, to SOTO, and by the January 27, 2022, seizure of 56 grams of methamphetamine and three firearms from SOTO's residence.

23.    PENA – the same person who first imported each of the cars used as load vehicles in the seizures listed above – was also the first person to drive the Ford Raptor into the United States on November 9, 2021.  PENA said he delivered the Ford Raptor to SOTO on that same day.  The vehicle was reported stolen on October 27, 2021, from a CarMax in Riverside, California, after an unidentified female presented the dealership with a fraudulent driver license. CBP crossing records reveal that it was driven into Mexico on October 28, 2021.  The vehicle was later seized on June 30, 2022. At the time of the seizure, the vehicle bore a VIN number that was different from the number assigned at the factory.[11]

//

//

---

[11] By examining factory records and other part numbers on the vehicles, law enforcement officers were able to identify the vehicle's factory VIN number.

**Benjamin MADRIGAL's June 2021 arrest and Target Accounts 5 and 6**

24.     MADRIGAL is currently charged in the District of Oregon (Case No. 22-CR-76) with possession with intent to distribute fentanyl and methamphetamine and is a fugitive from that case. He was arrested on June 19, 2021, as the passenger in a vehicle that contained approximately 55 pounds of methamphetamine, 953 grams of cocaine, and one kilo of fentanyl.  MADRIGAL was initially charged in state court. He failed to appear and has been a fugitive since that time. He was indicted in the District of Oregon on March 3, 2022.

25.     During that June 19, 2021, arrest Benjamin MADRIGAL possessed two cell phones, an iPhone assigned a number ending in 9276 and another iPhone assigned a number ending in 9376. Benjamin MADRIGAL admitted that the two phones belonged to him. Law enforcement searched both phones pursuant to MADRIGAL's consent, and found that each device was associated to a different iCloud account. The iPhone ending in number 9276 showed iCloud account "tona-loma8@icloud.com" **(Target Account 5)** and the iPhone assigned a number ending in 9376 showed iCloud account "tonylomas8888@icloud.com" **(Target Account 6)**.

**Identifying Benjamin MADRIGAL as the load driver coordinator**

26.     Pursuant to either a warrant or consent, or both, agents downloaded cellular phones used by ALFARO, BUSTOS, Rafael LOYA (BUSTOS' passenger and co-defendant), PINA, and GOMEZ. Each of those phones had contact with the number (509) 388-4344 (the 4344 number). GOMEZ saved the 4344 number under the contact

name "Tony@work". Text messages contained in GOMEZ's phone show that the 4344 number provided direction to GOMEZ during successful smuggling runs in the United States prior to GOMEZ's arrest. ALFARO saved the 4344 number as "Mr. T." Text messages in ALFARO's phone show that the 4344 number provided direction to ALFARO during successful smuggling trips prior to ALFARO's arrest. PINA saved the 4344 number as "T." PINA's phone also shows the 4344 number providing direction to PINA during successful smuggling trips prior to PINA's arrest in Grand Junction, Colorado.

27.     In addition, between July 23, 2021, and September 16, 2021, the 4344 number exchanged 528 phone calls, text messages, and voice messages with PINA's phone. Between July 22, 2021, and August 5, 2021, (the day GOMEZ was arrested) the 4344 number exchanged 173 calls, text messages, and voice messages with GOMEZ's phone.  Between August 13, 2021, and September 16, 2021, the 4344 number exchanged 111 calls, text messages, and voice messages with BUSTOS' phone. Between August 16, 2021, and August 28, 2021, the 4344 number exchanged 50 calls, text messages and voice messages with ALFARO's phone. The 4344 number also had 16 contacts with the phone believed to be used by ORTIZ, the deceased former leader of the organization in Yakima, Washington, along with numerous other numbers that were also in contact with load drivers and other persons who exchanged wire transfers with members of the organization

28.    Many of these communications with the 4344 number specifically reference drug smuggling operations. For example, GOMEZ sent "Mr. T," using the 4344 number, an image of PINA's driver's license on July 29, 2021, at 2:14 PM. "Mr. T" replied over the 4344 number and said "they are going t pay 6 per car to nic my old man." Which corresponds to the load driver's statements that they were paid $5,000 to $8,000 per loaded vehicle. ALFARO's phone also revealed several communications between ALFARO and "Mr. T" over the 4344 number.   On September 3, 2021, ALFARO sent an image of his driver's license to "Mr. T" who replied, "Dude is the address on the ID your actual address? Because the car title will get to that address." I believe that this is a reference to the vehicle registration being mailed to ALFARO. Text messages in PINA's and ALFARO's cell phones discussed keeping certain vehicles. "Marco" (BUSTOS) would have a new black car[12] and a truck was going to PINA. PINA's phone also revealed several communications between PINA and "Mr. T" using the 4344 number. On September 4, 2021, PINA texted the 4344 number: "Dude I got someone who wants to buy 1,000 blues [fentanyl pills[13]] for $2,000." The 4344 number responds: Ok dude grab the ones in the yellow bag."

29.    Two sources of evidence tie Benjamin MADRIGAL to the 4344 number. First, during an interview, Deliyla HERNANDEZ stated that she contacted MADRIGAL on the 4344 number on numerous occasions in 2021. Deliyla

---

[12] BUSTOS was driving a black 2019 Dodge Challenger.
[13] My interpretation of coded language is set forth in brackets, and is based on my training, experience, and knowledge of this investigation.

16

HERNANDEZ is Mayra HERNANDEZ's daughter and was formerly in a relationship with MADRIGAL. Second, GOMEZ's phone had a photo of a Washington state driver's license with MADRIGAL's photo bearing the name "Sebastian Torres." Subpoenas served on Money Gram show that on September 21, 2021, "Sebastian Torres" used the 4344 number to send a $1,000 wire to Raquel Madrigal, Benjamin and Benito MADRIGAL's sister.

**Proffer of Julio VARGAS and Benjamin MADRIGAL's order to Ricardo ORIZABA to murder MURILLO and HERNANDEZ**

30.     On December 8th, 2022, HSI and DEA agents conducted a proffer with Julio VARGAS-Birrueta. VARGAS was previously linked to this DTO and investigation after his name was discovered on an insurance card from a seized Infiniti Q50 in Yakima, WA that was used by this DTO. VARGAS was arrested by DEA and HSI Stockton in California on October 27, 2022, for distributing approximately 4,000 fentanyl pills (528.2 grams) (Charged in EDCA Case No. 22-CR-297-JLT-BAM). Six other persons were arrested with VARGAS, one of whom, Roberto SORIA, was also identified as a member of this DTO.[14] VARGAS told investigators that he has information about a murder that occurred in Yakima, WA after agents conducted several warrants in the area.

[14] SORIA received multiple wire transfers from Maria MARTINEZ, who also sent wire transfers to load drivers BUSTOS and PINA and to vehicle-coordinator SOTO. In January 2023, Maria MARTINEZ admitted to sending wires on behalf of ORTIZ and his spouse, Yareli BANUELOS.

17

31.   VARGAS said he was Benjamin MADRIGAL's cousin, and that MADRIGAL was the leader of the DTO after the death for former leader, ORTIZ. VARGAS identified ORTIZ and Benjamin MADRIGAL from a photo lineup. VARGAS said MADRIGAL supplied ORTIZ with powdered fentanyl and told ORTIZ it was cocaine. MADRIGAL did this to cause ORTIZ to overdose because he failed to pay a debt.

32.   Agents showed VARGAS a picture of MURILLO. VARGAS identified MURILLO as a former member of the DTO and said MURILLO was murdered in Yakima, Washington on or about the end of August to beginning of September 2022. VARGAS said that Benjamin MADRIGAL called him (VARGAS) approximately 30 minutes after killing MURILLO and his spouse, Mayra HERNANDEZ, and provided precise details. Benjamin MADRIGAL told VARGAS that it all started after HERNANDEZ's daughter, Deliyla HERNANDEZ, contacted MADRIGAL to inform him that MURILLO was talking to law enforcement. (I interviewed MURILLO and Mayra HERNANDEZ on August 22 and 23, 2022.)[15]  After Benjamin MADRIGAL heard this, Benjamin MADRIGAL confronted MURILLO. MADRIGAL met with MURILLO, searched MURILLO's cell phone, and found text messages between MURILLO and Mayra HERNANDEZ discussing how they were going to cooperate

---

[15] On that day I also seized from MURILLO a stolen and VIN-switched 2021 GMC Sierra that was imported by SOTO's theft ring.

with law enforcement and give law enforcement Benjamin MADRIGAL's location.[16]
After seeing this, MADRIGAL became enraged and drove MURILLO to a ranch
outside of Yakima.

33.   VARGAS said that Benjamin MADRIGAL called VARGAS
approximately 30 minutes after "having them killed," and said that he (Benjamin
MADRIGAL) had MURILLO and HERNANDEZ killed at the ranch. According to
VARGAS, Benjamin MADRIGAL said that once they were at the ranch,
HERNANDEZ and MURILLO were shot to death with an AK-47 style assault rifle.
VARGAS stated Ricardo ORIZABA was present when MURILLO and HERNANDEZ
were killed and is likely the one who pulled the trigger because ORIZABA always does
Benjamin MADRIGAL's "dirty work." Ricardo ORIZABA concealed the AK-47
murder weapon at an unknown location. VARGAS said that there were other people
there who witnessed the murder, but he did not provide their names, only a nickname
of "Panino."  Agents showed VARGAS a picture of Ricardo ORIZABA that was taken
during the surveillance in Wapato, WA. VARGAS confirmed the person in the
photograph was Ricardo ORIZABA.

34.   VARGAS also said that after MURILLO was killed, Benjamin
MADRIGAL contacted Mayra HERNANDEZ and used a "ruse" to get her to come to
the ranch style property to meet MURILLO. VARGAS said that Benjamin

---

[16] At that time, Benjamin MADRIGAL was a fugitive from the District of Oregon, as
noted above.

MADRIGAL said MURILLO lost his phone in order to get Mayra HERNANDEZ to the ranch to meet MURILLO. Once Mayra HERNANDEZ was at the ranch, she was shot with the same AK-47 style assault rifle. Benjamin MADRIGAL, ORIZABA, and other unknown coconspirators used a commercial grade backhoe to bury the bodies deep underground. Then they used the backhoe to move large amounts of dirt around the property to make it more difficult for the bodies to be recovered. (During the search warrant on September 8, 2022, agents observed a commercial grade backhoe located on the property).

35.     VARGAS stated that the ranch was used to store, weigh, separate, package and distribute narcotics. Vehicles containing concealed narcotics would drive to the ranch and have the narcotics removed from the vehicles and stored on site until it was distributed. VARGAS stated he had visited the ranch numerous times and had first-hand knowledge of the purpose of its location. VARGAS description of the ranch is corroborated. Agents served a federal search warrant on that property on September 8, 2022, and seized over 30 assault rifles along with drug packaging, U.S. currency and fentanyl pills.

**Deliyla HERNANDEZ's Interview and Target Account 4**

36.     Deliyla HERNANDEZ substantially corroborated VARGAS' version of events. Deliyla HERNANDEZ told agents that after they [HSI] had interviewed Mayra HERNANDEZ and MURILLO on August 23, 2022, MADRIGAL picked up MURILLO from her house a few days later and MURILLO was never seen again.

MADRIGAL told Deliyla HERNANDEZ that he was taking MURILLO to "feed the chickens."

37.    Then on September 2, 2022, Benjamin MADRIGAL messaged Deliyla HERNANDEZ and asked her to take her mother, Mayra HERNANDEZ, to a hotel parking lot in Yakima, Washington. Initially, Deliyla HERNANDEZ said that Benjamin MADRIGAL was going to take Mayra HERNANDEZ to meet MURILLO at the ranch and that MURILLO was waiting for her there. Benjamin MADRIGAL had set up a trailer where Mayra HERNANDEZ and MURILLO could hide out. Deliyla HERNANDEZ then informed agents that Benjamin MADRIGAL was going to take Mayra HERNANDEZ to a nearby residence to meet MURILLO. Deliyla HERNANDEZ drove her mother, Mayra HERNANDEZ, to the hotel parking lot where Benjamin MADRIGAL was waiting. Deliyla stated she knew it was Benjamin MADRIGAL because Mayra HERNANDEZ got into a vehicle only driven by Benjamin MADRIGAL.[17] However, rather than drive in the direction of the residence, Deliyla HERNANDEZ saw Benjamin MADRIGAL take Mayra HERNANDEZ in the direction of the ranch outside of Yakima and Deliyla HERNANDEZ had a "bad

---

[17] Deliyla HERNANDEZ identified the vehicle that her mom got into as a dark colored, newer model Cadillac SUV. Agents showed Deliyla a picture of a vehicle matching that description that was previously observed during surveillance at the ranch property and another property used by Benjamin MADRIGAL's sisters in Yakima. Deliyla positively identified the vehicle as the same one Mayra HERNANDEZ got into when she was last seen alive. Yareli BANUELOS also identified this vehicle as a vehicle used by MADRIGAL.

feeling." That was the last time Deliyla HERNANDEZ or anyone else saw Mayra HERNANDEZ. At that time, Deliyla HERNANDEZ believed that Mayra HERNANDEZ and MURILLO had fled to Mexico. However, she or anyone has not heard from her mother or MURILLO.

38.    Deliyla HERNANDEZ also stated that Benito MADRIGAL was working for MURILLO by transporting drugs in vehicles when he was arrested in the Ford Raptor on June 24, 2022.  Deliyla HERNANDEZ said that Benito MADRIGAL called her around June 23, 2022, and was boasting that he was smuggling drugs.  Benito MADRIGAL told her that they were taking the Ford Raptor, loaded with drugs, to Visalia, California, before returning to Los Angeles. Benito was working for MURILLO at that time. Deliyla HERNANDEZ knows this because she was living with MURILLO and HERNANDEZ during the summer of 2022, and she would often see MURILLO unloading and weighing drugs at their home in Yakima, Washington.  She saw them she saw them handle large amounts of a substances that she described as crystal like substances, white powder, and blue pills.  Based on conversations she heard in their home and on statements from Mayra HERNANDEZ, Deliyla HERNANDEZ understood that HERNANDEZ and MURILLO would earn $14,000 from each shipment of drugs.

39.    Deliyla HERNANDEZ said that MURILLO purchased the Ford Raptor from "Daniel" [SOTO] who lived in Los Angeles.

40. On January 18, 2023, U.S. Magistrate Judge Alexander Ekstrom signed search warrant (23-MJ-04015-ACE) authorizing agents to seize and search the contents of Deliyla HERNANDEZ's cellular device. Agents seized an iPhone 13 Pro Max (IMSI 310150600387036) and conducted a forensic extraction of the device. Agents found numerous contacts on the Deliyla HERNANDEZ's iPhone with MURILLO and Mayra HERNANDEZ. Agents also found photos and videos on the phone depicting Benjamin MADRIGAL, Benito MADRIGAL, ORTIZ, MURILLO, and Mayra HERNANDEZ, including one particular video of all those individuals together at a party. I believe those, photos, videos, and messages will exist in **Target Account 4** because one purpose of an iCloud account is to preserve photos and videos on an iPhone.  While this data is not, by itself, criminal, in combination with other facts revealed by the investigation it is evidence that is relevant to the drug trafficking conspiracy that is the target of this investigation. For example, the fact that all those persons were together at a party, while not criminal, is strong evidence that they know each other and have a prior association, which corroborates the witness statements set forth above.

41. During a search of the forensic download, agents observed the associated iCloud account to the device was **Target Account 4** (deliyla.andrade@icloud.com).

42. I believe that a search of Deliyla HERNANDEZ' iCloud account will yield information relevant to the Drug Trafficking Organization that is the subject of this affidavit. Deliyla HERNANDEZ stated that she was in contact with both Benjamin MADRIGAL and Benito MADRIGAL while both of them were distributing significant

quantities of controlled substances. Deliyla HERNANDEZ was also in contact with her mother, Mayra HERNANDEZ, and MURILLO, Mayra HERNANDEZ's domestic partner, while both were actively receiving and distributing controlled substances, cash, firearms, and stolen vehicles (as corroborated by the September 8, 2022, search of their shared residence).

## Yareli BANUELOS' Interview

43.     On December 9, 2022, HSI agents interviewed Yareli BANUELOS, the former spouse of deceased ORTIZ who formerly led the organization in Yakima.

44.     BANUELOS was shown a picture of two individuals and identified one of the males as "Ricky" (Ricardo ORIZABA). BANUELOS said that Ricardo ORIZABA worked for her late husband (ORTIZ) prior to his death and now works for Benjamin MADRIGAL, the current leader of the DTO. BANUELOS said when Ricardo ORIZABA worked for ORTIZ, he [ORIZABA] took care of the animals and moved drugs. BANUELOS said she feared ORIZABA because he was a dangerous person and associated with dangerous people.

## Corroboration for Ricardo ORIZABA's Relationship with Benjamin Madrigal in calls and wire transfers

45.     Phone toll records and financial transaction records corroborate these witnesses' statements regarding the relationship between Benjamin MADRIGAL and Ricardo ORIZABA.

46.     TRAC is a database of financial transactions accessible to law enforcement. The TRAC database indicates that on July 28, 2022, Ricardo ORIZABA used phone number (509) 830-9372 (the "9372 number) to send a $2,500 wire transfer to Ignacio Soria, who is a family member of Roberto Soria, who is charged with VARGAS (described above) with drug crimes in the Eastern District of California. VARGAS said that he was working with Benjamin MADRIGAL at the time of his arrest.  I identify Ricardo ORIZABA as the person using the 9372 number because he sent at least six other wire transfers from that number and (509) 961-9683 which he also associated with his Washington state drivers license number, his home address, and his date of birth.  Toll records indicate that Ricardo ORIZABA used the 9683 number to call Benjamin MADRIGAL (using the (213) 631- 0383 number) twice, on April 22, 2022. Deliyla HERNANDEZ provided Benjamin MADRIGAL's 0383 number to agents and stated she had communicated with Benjamin MADRIGAL on that number.

47.     Toll records show that between April 10, 2022, and May 23, 2022, Benjamin MADRIGAL (using the 0383 number) exchanged 132 phone calls and text messages with Jose ORIZABA (using (509) 759-6232[18]). Using (213) 631-0383, Benjamin MADRIGAL also exchanged 132 phone calls with Benito MADRIGAL (using (509) 654-5471[19]) between March 15, 2022, and May 19, 2022.

---

[18] A cell phone assigned the number (509) 759-6232 was seized from Jose ORIZABA during the traffic stop in Tulare, CA on June 24, 2022. ORIZABA was shown the device and admitting the phone belonged to him.

[19] Benito MADRIGAL sent and received 6 wire transfers while using this number, each one listing his date of birth, his home address in Yakima, WA, and one of which listed

**Search warrant of 321 Yakima St, arrest of ORIZABA, and the seizure of drugs, weapons, and the white iPhone using Target Accounts 1-3**

48.     On January 30, 2023, the Honorable Alexander Ekstrom, U. S. Magistrate Judge signed a warrant authorizing a search 321 Yakima Street.

49.     On February 8, 2023, HSI agents conducted surveillance at 321 Yakima Street in preparation for the execution of the search warrant. Agents observed Ricardo ORIZABA exit the residence and enter a black Chevy Camaro and depart the location. Agents then contacted Ricardo ORIZABA as he was stopped in a nearby parking lot. Ricardo ORIZABA consented to a search of his car. In the car, agents discovered multiple firearm magazines and ammunition inside the vehicle along with the white iPhone (found in the vehicle's center console). ORIZABA stated that the phone belonged to him.

50.     While agents were searching Ricardo ORIZABA's car, other agents simultaneously executed the warrant at 321 Yakima Street where they seized the narcotics, firearms, and other items referenced above. ORIZABA was arrested and charged in the Eastern District of Washington with Possession with Intent to Distribute Fentanyl 21 U.S.C. §§ 841 and Possessing a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c) (EDWA Case No. 23-CR-2005).

---

his Washington state driver's license number. One of those wire transfers was a remittance from Julio VARGAS, which further corroborates VARGAS's claim to have worked for this DTO.

51.     Following his arrest, ORIZABA was ordered detained in a detention center in Yakima, Washington.  Agents listened to his consensually recorded calls from the detention center and, among his first calls, agents heard ORIZABA tell his sister to "call Tony" [Benjamin MADRIGAL] and tell him what happened. Based on that call, and in the context of this DTO as set forth herein, I believe that Ricardo ORIZABA continued to work with MADRIGAL up through as recently as February 8, 2023.

52.     On March 10, 2023, U.S. Magistrate Judge Mitchell D. Dembin in the Southern District of California issued a warrant to search the white iPhone. Pursuant to that warrant, I searched the white iPhone on March 21, 2023, and found evidence on that phone that ORIZABA is using **Target Accounts 1-3**.  Specifically, I noted that **Target Account 1** is the account that the user signed into at the time the white iPhone was seized. I found this information in the white iPhone's settings menu, as pictured below:



53.     I also found screenshots of **Target Accounts 2 and 3** saved in the white iPhone's photos. That is, just as the white iPhone displayed Target Account 1 in settings when it was connected to Target Account 1, the phone's user had previously connected to Target Accounts 2 and 3 and had saved a screenshot of the home screen at the time it signed into those accounts. Those screenshots are pictured below:

Screenshot of **Target Account 2**, saved to the white iPhone's photos:



//

//

//

Screenshot of **Target Account 3**, saved to the white iPhone's photos:



The screenshots of the white iPhone logged into **Target Accounts 2** and **3** show that the phone had recently logged into iCloud using those accounts. In particular, I note that the date February 4 displayed when the screenshot of **Target Account 2** was saved. Agents seized the phone on February 8, 2023. I also know from training and experience that iPhone users can easily switch the account connected to their phone by signing in or out of different Apple ID's or accounts. I also know that a quick and efficient way to save account information is to take a screenshot of the account on the phone. I believe that ORIZABA did that here, and that he saved the login information for **Target**

**Accounts 2** and **3** so that he could quickly remember the different accounts he is using. Based on these different accounts saved in the white iPhone, I believe that ORIZABA used all three **Target Accounts** interchangeably.

54.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Phones**.  In light of the above facts and my experience and training, there is probable cause to believe that Benito MADRIGAL and Jose ORIZABA were using the **Target Phones** to communicate with others to further the importation of illicit narcotics into the United States.  Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event.  Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim.

55.     As to the **Target Accounts**, there is probable cause to believe that the conspiracy described in this affidavit was in operation from as early as June 19, 2021,

through as recently as February 8, 2023, and that Ricardo Orizaba was using Target Accounts 1-3 to communicate with Benjamin MADRIGAL and others in connection with that conspiracy. There is also probable cause to believe that Deliyla HERNANDEZ used **Target Account 4** to communicate with Benjamin MADRIGAL, and that Benjamin MADRIGAL uses **Target Accounts 5** and **6**, in connection with the conspiracy described herein.

56.     Accordingly, I request permission to search the **Target Accounts** for data beginning on June 19, 2021, up to and including February 8, 2023, and to search the **Target Phones** for information beginning June 19, 2021, through June 24, 2022.

## Background Concerning Apple[20]

57.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

58.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop

---

[20]     The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

59.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

      a.   iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

      b.   iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and

32

Wi-Fi network information synchronized across multiple Apple devices.

    c. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

    d. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users.  It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

    e. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

    f. App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

60.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds

to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

61.     Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

62.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query

logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

63.     Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

64.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo

Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.  Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

65.   This investigation involves several members of the DTO communicating with one another in the furtherment of the criminal activity. Specifically, Benjamin MADRIGAL, Benito Madrigal, Jose Orizaba and Ricardo ORIZABA used Apple devices to communicate with one another while they transported distributable amounts of illicit narcotics, including fentanyl, within the United States. Those devices store additional information within their respective iCloud accounts that would not be found during a search of the device's forensic extraction. The information requested from Apple is all stored information associated to the iCloud account such as text messages, documents, images and videos, notes, and contacts. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records

described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

66.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

67.    As of the date of this affidavit, Benjamin MADRIGAL, Benito Madrigal, Jose ORIZABA, and Nicholas PINA are wanted fugitives. Their current whereabouts are unknown, but each wanted fugitive is suspected of hiding within the Central and Eastern District of California, and Eastern District of Washington. Agents have conducted surveillance and their last known locations, performed witness interviews, reviewed surveillance footage, phone toll analysis, financial record analysis, and historical device ping locations in order to locate the wanted fugitives. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as

geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

68.   Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

69.   Analytical review of financial transactions show this DTO used wire remitting services such as MoneyGram and Western Union to launder its illicit proceeds. To date, there has been at least $100,000 in wire remittances from the United States to Mexico by persons linked to the DTO and the investigation. Witness interviews also reveal the DTO uses stolen vehicles to conceal bulk cash that is then transported to Mexico. Review of the information requested per each account may reveal banking institutions used by the targets. Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of

apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

70.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

### Background Relevant to Searching the Target Phones

71.    Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Phones**. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Phones** to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also

often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Phones** for data beginning on August 8, 2021, up to and including June 24, 2022.

**Methodology for Searching the Target Phones**

72.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some

solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

73.    Following the issuance of this warrant, I will collect the **Target Phones** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

74.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

**Prior Attempts to Obtain this Evidence**

75.    Law enforcement has previously attempted to obtain the evidence sought by this warrant. Agents attempted to perform a forensic extraction of the **Target Phones** but were unsuccessful at that time. Since that time, there has been Cellebrite software

updates that may allow agents to successfully download data from the **Target Phones**. There have been no prior attempts to obtain information from the **Target Accounts**.

### Conclusion

76.     Based on the forgoing, I request that the Court issue the proposed search warrants.   I submit there is probable cause to believe that a search of the **Target Account**s and the **Target Phones** will yield evidence of violations of Title 21, United States Code, Sections 841 and 846.

77.     As to the **Target Accounts**, pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple.   Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A-1, and seize the items listed in Attachment B-1.

//

//

//

//

//

//

78.     As to the **Target Phones**, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A-2 through A-4, and seize the items listed in Attachment B-2 using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Travis Desmond*

Special Agent Travis Desmond
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 29th day of March, 2023.

Jill L. Burkhardt
United States Magistrate Judge

## ATTACHMENT A-1

## Property to Be Searched

This warrant applies to information associated with the following Target Accounts that are stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California:

**Target Account 1**: marcy.kennedy1@icloud.com

**Target Account 2**: ricardo.orizaba@icloud.com

**Target Account 3**: flowersonthe14@icloud.com

**Target Account 4**: deliyla.andrade@icloud.com

**Target Account 5**: tona-loma8@icloud.com

**Target Account 6**: tonylomas8888@icloud.com

## **ATTACHMENT B-1**

### **Particular Things to be Seized**

### **I.      Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on April 11, Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the accounts, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the accounts (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple

2

services), including serial numbers, Unique Device Identifiers ("UDID"),

Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media

Access Control ("MAC") addresses, Integrated Circuit Card ID numbers

("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity

Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile

Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile

Subscriber Integrated Services Digital Network Numbers ("MSISDN"),

International Mobile Subscriber Identities ("IMSI"), and International Mobile

Station Equipment Identities ("IMEI");

      c.    The contents of all emails associated with the accounts from June 19,

2021 to February 8, 2023, including stored or preserved copies of emails sent to

and from the account (including all draft emails and deleted emails), the source and

destination addresses associated with each email, the date and time at which each

email was sent, the size and length of each email, and the true and accurate header

information including the actual IP addresses of the sender and the recipient of the

emails, and all attachments;

      d.    The contents of all instant messages associated with the account from

June 19, 2021 to February 8, 2023, including stored or preserved copies of instant

messages (including iMessages, SMS messages, and MMS messages) sent to and

from the account (including all draft and deleted messages), the source and

destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

4

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 21 United States Code sections 841 and 846, those violations involving distribution of controlled substances by Benjamin MADRIGAL, Ricardo ORIZABA, Benito MADRIGAL, Jose ORIZABA, Cesar MURILLO, or Mayra HERNANDEZ and occurring after June 19, 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.     tending to indicate efforts to distribute controlled substances within the United States;

b.     tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

c.     tending to identify co-conspirators, criminal associates, or others involved in distribution of controlled substances within the United States;

d.     tending to identify travel to or presence at locations involved in the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points, or the whereabouts of persons involved in such activity;

e.     tending to identify the user of, or persons with control over or access to, the Target Accounts; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.